LABORATORIES AND ABL PATENT LICENSING 2013-11-86.  This video was made in Cooperation with the U.S. Department of Labor.  The claims in this case do not preempt all the full scope and all practical applications of the abstract idea of evaluating, constructing treatment options, treatment regimens for medical conditions. There are three factors that control this case. Aren't they simply mental steps plus a computer? No, Your Honor, these are not simply mental steps. The mental steps doctrine refers to things that can be done in the human mind. When you program a computer, that is, the original steps in a programmed computer must be done by a human being, but then they are instrumented, they are programmed in the computer, and the computer executes those programs. If the rule was that mental steps wiped out computer programs, then every computer program patent, every software patent, would be ineligible. So it can't simply be that because an algorithm starts in the human mind, that that renders software patents invalid, because that would wipe out all software patents. But I don't actually think that that's quite the point. The point is that the mental step of noticing symptoms, considering treatments that might be beneficial with risks for those symptoms, and then saying, these treatments seem preferable to another, all of that can, in fact, and routinely does, take place inside the heads of doctors. So that is a mental process. What does the computer do here? The computer carries out that process. And it doesn't do it in a way that there's nothing in the claims about how the computer is doing something particularly snazzy in that process. The simplest two possible treatment preference lists would be covered. Respectively, the claim does not cover that. The claim focuses on both the method claims and the apparatus claims, recite a computing device that has three specific knowledge bases. This claim does not preempt doctors from doing what they do. This claim recites an expert system. No, but that's not the question. The question is not whether the claim covers the doctor's activities, the mental steps. The point is that under cyber source, for example, that if this could be done by a doctor without the use of a computer, then merely adding a computer doesn't make it patent eligible. Understood. But we're not merely adding a computer here. An expert system is a computer system. You can no more have an expert computer system than you can have a radio without a transmitter, an antenna, and a receiver. This is, by definition, an expert system is a computer system. And the claims recite that. But cyber source says that if it's something that could be done in the doctor's mind, it doesn't say that explicitly, but that's the effect of it, that adding a computer to do it doesn't make it patent eligible. Understood. In cyber source, you literally could do that claim. You can literally write down what the IP addresses are and what the credit card number is, and that was admitted. All it takes is doing the list. You cannot do what is claimed here. An expert system goes beyond. You may not be able to do it in all of its applications, but some of the applications that are within the scope of the claim could easily be done by a doctor. No? No, Your Honor. They cannot. Why not? Again, the invention here, the technology here is an expert system. Expert systems are a specific type of technology recognized in the patent office. There are over 10,000 expert system patents. An expert system by design takes information, a body of information that no one human being can keep in their head. This is not something a doctor can do. This is not something a room full of doctors can do. It takes that information, it organizes it in a particular way, and then upon computation, it provides an answer. Again, if we look at the way computers operate, they do not do what brains do. They do not do what minds do. They operate in a particular way. That this is like, this is in the area of medical science, doesn't make it exactly what a doctor does, no more so than an adding machine in the sense of an adding machine does what a computer does. There are many types of expert systems. There are expert systems in aeronautics that help fly planes. There are expert systems that control how elevators operate. They encode information, and they execute programs. But if the rule is that if something can be done in the human mind, an algorithm can be, steps can be done in the human mind, then the result would be, first order, all expert systems would be per se invalid because all experts, the argument would be, all expert systems do is they just do what people do. No, no, I mean the way that the Supreme Court in Mayo against Prometheus structures the analysis is to say if you're a challenger, you first identify what the abstract idea, or in that case the laws of nature, natural correlations. And then you look and you say, what else does the claim require? The else has to be in some sense significant. My word, not the court's word. The court says enough. It says routine, non-obvious, all that kind of stuff. So it's just not true to say that all expert systems would be invalid. All the ones that would be valid would be those that add something to the mental process that's actually, again, to use a Mayo word, inventive. Exactly. And what we have here is on this record, we have that evidence. We have a finding by the examiner that the claims here, the system described here, the method described here, had a significant limitation, a meaningful limitation, in the three databases that was not obvious, that was not disclosed in the prior art, it was not conventional. That's the meaningful limitation. And that's why these claims do not preempt doctors. They do not preempt other companies from having other types of medical systems that help doctors. This does not preempt other types of expert systems. So the doctrine is preemption. The question is, does it preempt all practical applications of an abstract idea? There's no evidence in this record that it does. There's no testimony. There's no expert opinion. There's nothing. What we do have, what the record does show, is a finding by the examiner that there were other medical expert systems which practiced this abstract idea and yet did not have that limitation. So if it doesn't have that limitation, that's which doesn't preempt if it comes before, doesn't infringe if it comes after. They would not preempt it. The question about practical application is really a question about what goes on in the world. So it's a question of facts. This patent is a 13-year-old patent. A lot of 101 water has gone over the dam since then. Agreed, a lot of 101 water. And this is an expert system. This court has never addressed the patent, as far as I know, has never addressed the patentability of expert systems. What we have here is a specific improvement on existing technology. Yes, there's a lot of 101 water that has gone over the dam. And this court has now focused on preemption as the test, preemption of practical applications, the real-world effect. And that's what we're talking about here. What is the real-world impact? Does this stop doctors from practicing medicine? No. Does it stop them from researching treatments? No. Does it stop other companies from having other computer systems that would implement ways of advising doctors? No, it doesn't. This is a very specific claim on an expert system that has three specific knowledge bases, which are particularly claimed. And it was the examiner who found that limitation to be the one that distinguished over the references, over the art. Do you think the Supreme Court has told us that preemption is more important than mental steps plus computer? The Supreme Court's jurisprudence focuses on preemption. Gottschalk v. Benson, through Fluke, through Deere, through Bilski, through Prometheus. Prometheus was a law of nature case. What case says that's the sole test? I'm sorry, Your Honor, I didn't say it was the sole test. The jurisprudence has developed. So in Benson, we talk about preemption of mathematical algorithms. In Fluke, we talk about preemption there, the inventive concept. In Deere, the focus is whether the claims as a whole preempt the use of the Arrhenius equation. In Prometheus, the question is whether they preempt the use of the correlation. And this court itself has set forth the integrated approach of preemption. That the sinque non is the question of, is the full scope of the claim, in the real world, the practical application, preempted? And are there meaningful limitations? So we look at the claim language. We look at the technology, which is an expert system. If the technology here is the relevant audience using the Prometheus language, if the relevant audience was doctors and what doctors do, then the examiner would have classified this patent into, for example, class 600 or 129 medical procedures and surgery. What difference does it make what classification the patent office treated as falling within? Because that informs us as to who the relevant audience is. Who is one of skill in the art? What is the relevant technology base? And here, the classification shows us, in a well-understood classification, 706 924, of which there's over 10,000 patents focused on this type of technology. If the examiner thought what this claim is about, what this claim is about is what doctors do, he would have classified it in surgery. So we have evidence in the file history as to what the subject matter of the invention is. Had the examiner thought it was what doctors do, he would have classified it differently. This is evidence in the record. So if we look at the claim language, and again, I want to direct focusing on the claim language, we don't have just a computing device sitting naked. We have a computing device, and it comprises three specific knowledge bases. So this is unlike, for example, in CyberSource, where you just had this method claim, and all it did was take two things, IP addresses and credit card numbers, and you could put them in a list. And that was acknowledged. This is unlike CLS, where what you had was this basic idea, the fiction, essentially, of a shadow account, and a debit account, a financial invention. Here we have something specific. We have something about patients and drugs. This is different, for example, from the claim in Bancorp, which was just the artificial structures of a fee calculator and a policy value calculator. We have claimed a particular computing system unlike other computing devices, and that was the distinction found by the examiner. So if we look at the preemption doctrine, and we look at the presumption of validity, and we look at the rule on summary judgment, that the inferences have to be drawn in our favor, then the question becomes, does this claim actually read on a human mind, and does it preempt all practical applications? And I'll reserve my time for rebuttal. We will save it for you, Mr. Sachs. Thank you, sir. Mr. Samuels. Good morning, Your Honors, and may it please the Court. Before you get to the arteries here, I have a question about the capillaries, okay? And that relates to which of the claims are properly at issue in the declaratory judgment action. As I understand it, it's specified, stipulated that only claims 1 and 23 of each of these two patents were asserted for infringement purposes, and yet the district court here has invalidated all of the claims of each of the two patents. And our decision in Fox might be read to suggest that that's not a correct approach. So what's your answer to that? Well, Your Honor, my answer to that is, in the first instance, this case started out as a declaratory judgment action. It wasn't a declaratory judgment counterclaim. So Smart Gene put all of the claims at issue in its declaratory judgment action. Correct. The question is, could they? Was there a case or controversy with respect to the unasserted claims here? Well, at the time that the action was filed, there were no claims asserted because it was filed as an affirmative declaratory judgment. There was a Texas case, though, wasn't there? There was a Texas case, but that case did not proceed far enough. It was dismissed on personal jurisdiction grounds. Correct me if I'm mistaken about this. The Texas case didn't assert the infringement of all of the claims of the two patents, right? I believe it was just a generic pleading so that the claims weren't specified, yet they hadn't gotten through the patent rules procedures. It was dismissed under Rule 12, so I don't think it got to the point where the claims at issue became clear. What happened here in this case is that ABL asserted only Claims 1 and 23 in the infringement counterclaim. However, Smart Gene never retracted its assertion that the entire patent was invalid. And so, going forward, Smart Gene's position was all the claims were invalid. And it was argued at the district court that Claim 1 of the 786 patent was representative of all the claims in the patent because there weren't significant differences between the method claims and the system claims in the 786 patent, nor were there significant differences between the method and system claims in the 988 patent for the purposes of Section 101. What's your answer to the argument that preemption is the test and there was no preemption here? Well, Your Honor, as I understand the preemption test, we look at whether all practical applications of the claim were preempted, and if not, whether what's left over is pre- or post-solution activity. That's something I didn't hear my colleague mention. And Smart Gene would assert that here, the claim is really nothing more than adding a computer to the mental steps that doctors can and do do at all times. ABL contends that the claim is directed to an expert system. I don't see the word expert system anywhere in this claim. In fact, the claim is broad enough to cover any method that employs a computing device that has a first knowledge base, a second knowledge base, and a third knowledge base. And the knowledge bases were argued by ABL to be defined simply as databases. During the claim construction procedure, that issue was briefed at the District Court. The District Court didn't make a formal finding, but the issue was briefed, and the District Court did have comments on what the claims might mean. ABL advanced a position that a knowledge base should mean a database. So if that's the case, then Claim 1 includes three databases. Three databases that have data in them. This is not the definition of an expert system. They could have written the claim differently. They could have claimed the things that make an expert system an expert system. It could have been right there in the claims. But they were not. They elected to claim it differently. So based on the way that Claim 1 is drafted, it preempts many practical applications, and that which is left over is merely the computer doing nothing more than what the human being can do in his or her own mind. In this case is... And that's preempted, isn't it? Yes, Your Honor. I would say that it is. I would agree with Your Honor. And I would say that this case presents facts very similar to the Bancorp case. Can I ask you something? What was the subject of the reexamination process? What was examined? What was the subject of the reexamination process? The claims of both the 786 patent and the 988 patent went under reexamination. There was prior art that was before the patent and trade law. And I gather in the reexamination there wasn't, because there couldn't have been a 101 inquiry specifically. That's correct. But there was an inquiry into whether at least some of these elements of the claims were, again, a non-technical term, significant in distinguishing certain prior art. That's correct. There was a prior art determination. Why doesn't that determination, I realize it's not conclusive, but essentially match up with the routine, non-obvious, et cetera, aspect of the Supreme Court's inquiry into what's added to an underlying abstract idea over on the application side of the world. Why doesn't a determination by the PTO in making a 102 or a 103 inquiry saying, oh, this is, some of these elements here help make this new and non-obvious amount to satisfying whatever the Mayo phrase is about what is enough in addition to an underlying abstract idea? Well, I guess my answer would be twofold to that question. One, it would certainly depend on the prior art that's before the patent office as to whether or not that prior art encompasses the abstract idea that we're And I would also say that 101 is a separate issue to look at. Actually, tell me just a little something about the prior art that was part of the re-examination. So, the prior art that was part of the re-examination, there were other computerized systems that assisted the doctor in determining whether, finding an appropriate therapeutic treatment regimen. However, what I would say about that is every time a litigant comes to the court, they haven't issued patents, so they've always passed 101 or 102. So, if the analysis is if you pass 101, 102, I'm sorry, if you pass 102, 103, then you pass 101, then 101 would never be able to block a patent because every litigant that comes up has a patent and they have passed 102 and 103. Can I ask one follow-up question that actually goes back to the capillary question? Yes, Your Honor. Was there any discussion either by you or the other side about whether there was an underlying real-world live controversy, a threat either by words or assessment by you of potential exposure to claims other than 1 and 23? There was never a discussion as to whether there was an exposure directed to particular claims. What came up during the Rule 59 briefing, and I will take a moment to address that issue, that evidence, whether that information should be properly before it, Your Honors, but what came up in that context when ABL first alleged that there was no case or controversy, the first allegation that there was no case or controversy came in the Rule 59 motion for reconsideration. So, Smart Gene first addressed it when it was first raised. In that briefing, there was declaratory evidence from Smart Gene's principle testifying to the harm that's been caused to Smart Gene in the marketplace by ABL's use of the patents and not any particular claim of the patents, but the patents themselves, which is why the entire set of patents was at issue. Well, I suppose what you're saying is the evidence of that is the Texas action where they asserted the patent without differentiating among the claims. That could be additional evidence in addition to the declaration. In fact, in the Texas action, the assertion was not limited to predict the claims, is that right? I would have to double-check that, Your Honor, but I don't believe that it was, but I would have to double-check that. The declaratory assertion is separate and apart from the Texas action. This was marketplace activity. However, Smart Gene's position is that none of the information that was submitted with the Rule 59 motion is properly before this court. The district court properly excluded that information. The Rule 59 motion was brought, excuse me, the Rule 59 motion was brought on the basis that Prometheus was a change in the law, and this court has even said that Prometheus was not a change in the law, and the evidence that AVL attempted to put before the district court certainly could have been put before the district court during the summary judgment proceedings. The Bielski case makes that sort of evidence relevant. Smart Gene certainly argued that this was a mental steps case, and if AVL thought that it was not and they had evidence that the steps could not be performed mentally, they could have brought it forward during the original summary judgment proceedings. That's all true, in the sense that the summary judgment motion covered all the claims in the patent, but I think there's still an independent obligation to determine whether there's a case or controversy with respect to all of the claims. I think it might be helpful if you could give us a short letter informing us as to what was at issue in the Texas Act and whether your recollection of it is correct that it was addressed to the patent as a whole without singling out individual claims. A joint letter? A joint letter, sure. Very well, Your Honor. And if Your Honors have no further questions. Thank you, Mr. Samuels. Mr. Sachs, if we don't agree with your argument, should all three types of claims be considered together? All the claims contain the common limitation of a computing device with three specifically claimed knowledge bases, so I will agree with that. Given that nugget, they do all come together. The court on the 112, the court on the system claims, those are means for limitations which were not construed in this claim, and we do have to consider those especially. I'd like to address the arguments raised by Smarching first, that Smarching never retracted its allegations of what was at suit. In a statement of material facts, Smarching itself said, in this litigation, ABL is only asserting claims 1 and 23 of both the patents. At that point, the case of controversy was now focused on claims 1 and 23. The rest of the cases, claims were no longer subject to the district court's jurisdiction. Well, that's not the same thing as a covenant not to sue on the other claims. And if, in fact, under hypothetical, if the Texas action had asserted all of the claims, why wouldn't that create a case of controversy that would give rise to declaratory judgment? That was in another case. That was no longer in this case. Well, but we've had numerous declaratory judgment cases where the allegation of infringement was made in another forum. And if there is an allegation of infringement of all of the claims in the Texas action or an undifferentiated claim, certainly that gives rise to an ability to file declaratory judgment action, whether or not the counterclaim in the declaratory judgment action is limited to particular claims. But this was a statement. Your Honor is correct. But this was a statement not by ABL as to what ABL was asserting. This was a statement by SG, by Smarching, as to what it was believing that the scope of this litigation was about as to claims 1 and 23. That's irrelevant. Suppose three months before the declaratory action was filed, there had been a letter that was sent by advance to Smarching saying, you're infringing all of the claims of these two patents. That would be sufficient to give rise to a declaratory judgment action, even if the subsequent infringement counterclaim was limited to particular claims. Right, but then again, the case of controversy must continue at every stage. So I understand, and I think that's the only answer I can give you at this time. I'd like to address, if I may, the aspect about the claims do not reside in an expert system. No, the claims are not there. But if a claim said an apparatus comprising a receiver, an antenna, and an amplifier, we would know, one of skill in the art would know that's a radio. It doesn't have to say an expert system. The claims are written to one of skill in the art. Second, as to this question about knowledge bases and databases, what was being construed there is the word, not the entire claim limitation, a knowledge base of the various elements, but the word knowledge base itself. That construction, yes, that can be a database. But one must consider the entire limitation, which are a knowledge base of particular information. So it's a knowledge base that comprises the treatment regimes, the expert rules, so on and so forth. So it's important to parse between the full element itself and that particular word, what a knowledge base is. As to the 102 and 103 issue, that's a general proposition. In this case, it went to the very element, the very element, the three knowledge bases. That's what's distinguished. There could be other cases in which the 102, 103 determination of non-obvious went to some other element. But it's the very element here that is the substantial, that is the meaningful limitation. That was the very one that the examiner found was not in prior systems that treated, that provided these types of evaluations. That's what makes it meaningful, and that's why it doesn't preempt. As to Prometheus, I would like to focus on Ultramershal. This case is like Ultramershal. We have summary judgment, but we have no conclaimed construction, we have no discovery, and that's what the case is decided on. The posture is like Ultramershal, not like Accenture or CLS. Thank you, Your Honor. Thank you for your time. Thank you, Mr. Sachs. In case we take an undervote. The honorable court is adjourned until tomorrow morning at 7 a.m.